Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 4874 | **DATE** | March 14, 2002 |
| **CASE TITLE** | Hartmarx Corporation v. JBA International, Inc. and JBA Holdings, PLC | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Hartmarx Corporation's Motion for Partial Summary Judgment as to Counts II and III of the Amended Counterclaim (doc. #92); JBA's Motion for Summary Judgment on Hartmarx's Claims (doc. #95)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial [set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the attached reasons, the Court **GRANTS** Hartmarx's motion for partial summary judgment on Counts II and III of the Counterclaim (doc. #92), and **DENIES** JBA's motion for summary judgment (doc. #95). Joint pretrial order and motions in limine to be submitted in triplicate to chambers on April 4, 2002. Responses to motions in limine to be filed by April 25, 2002.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAR 15 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | U.S. DISTRICT COURT CLERK | | 128 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 02 MAR 14 PM 4:56 | | |
| | | | date mailed notice | |
| JHC | courtroom deputy's initials | FILED-ED TO | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HARTMARX CORPORATION,
    Plaintiff,

v.

JBA INTERNATIONAL, INC. and
JBA HOLDINGS, PLC,
    Defendants,

and

JBA INTERNATIONAL, INC.,
    Counter-plaintiff,

v.

HARTMARX CORPORATION,
    Counter-defendant.

CASE NO. 99 C 4874

JUDGE WILLIAM J. HIBBLER

## MEMORANDUM OPINION AND ORDER

This controversy arises out of a software licencing/customization/implementation deal between Plaintiff Hartmarx Corporation ("Hartmarx") and Defendants JBA International Inc. and JBA Holdings, PLC (collectively referred to as "JBA"). Hartmarx sued JBA alleging violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (Count I), fraudulent inducement (Count II), breach of contract (Count III), and breach of guarantee (Count IV). JBA then countersued claiming breach of contract (Count I), breach of oral or implied in fact contract (Count II), quantum meruit (Count III), and copyright infringement (Count IV). Pending before the Court are JBA's motion for summary judgment on Counts I, II and III of Hartmarx's Complaint, and Hartmarx's motion for partial summary judgment on Counts II and III of JBA's counterclaims. For the following reasons, JBA's motion for summary judgment is **DENIED**, and Hartmarx's motion for partial summary judgment is **GRANTED**.

## BACKGROUND

In 1995, Hartmarx and its auditor/consultant, Pricewaterhouse Coopers, LLP ("Price"), began discussing the possibility of centralizing Hartmarx's information systems environment. At that time,

Hartmarx functioned as a holding company for seven operating units that manufactured and/or distributed men's and women's clothing, but it did not have a standardized technology across all of its divisions. Hartmarx therefore sought a Year 2000 compliant information system that could link all aspects of the manufacturing and distribution processes of its businesses on a single integrated system. With that goal in mind, Price subsequently prepared a list of approximately 1500 global business functional requirements Hartmarx would require in an information system. In July 1996, Price distributed the list along with a Request for Information ("RFP") to various software vendors, and asked them to identify the level of support its software could provide on a scale of 0 to 4 (no support to fully supported) for each functional requirement.

JBA, an international supplier of enterprise resource planning ("ERP") software, was one of the vendors from whom Price solicited information. ERP software is designed to assist a company in running its entire business on a single computer-based system. And, for companies involved in the manufacture and distribution of apparel, JBA specifically offered its "System 21 Style" ERP software. JBA responded to the RFP on August 5, 1996, indicating, not surprisingly, its System 21 software could fully support a significant number of Hartmarx's listed functional requirements. Nevertheless, JBA and Hartmarx recognized there were still some critical business functions Hartmarx required that JBA's standard System 21 software did not sufficiently support (i.e., those functions JBA did not rate "4"). Consequently, in September 1996, JBA sent Hartmarx a "final gap response" identifying the "gaps" in its software requiring enhancements or modifications in order to meet Hartmarx's stated business needs. Hartmarx personnel eventually attended a personal demonstration of the System 21 software conducted by JBA, and visited six customer sites recommended by JBA where the software was being implemented. Throughout the vendor selection process, JBA made several representations concerning the functionality of its standard System 21 Style software, as well as its ability to modify the software in order to fill in the gaps, and assist with implementing Hartmarx's new information system.[1]

---

[1]JBA represented, among other things, that: (1) Version 3.4 of System 21 software fully supported the vast majority of Hartmarx's functional requirements; (2) JBA would provide a total business solution to Hartmarx's information systems needs, including hardware, software, customization, implementation, training and on-going support; (3) the System 21 software was a solid,

Price, whose job was to plan and manage the project, identified several risks in undertaking this complex ERP project, but after evaluating several vendors, and finding JBA's System 21 software offered the highest functionality fit (at 81%), it recommended Hartmarx select JBA's products. Hartmarx agreed to proceed with JBA. Over the next couple of months, then, from December 1996 though February 1997, JBA and Hartmarx, each represented by counsel, engaged in extensive contractual negotiations regarding the terms of the deal. Finally, on February 14, 1997, the parties executed an Agreement in excess of 50 pages. The parties agreed Hartmarx would license the System 21 software, and JBA would construct over 40 specific software modifications/enhancements (detailed in almost half –24 pages –of the Agreement), and provide, among other things, software support services and training. In addition, JBA incorporated its response to the RFP into the contract, and warranted that "[its] statements are a true and fair representation of the software functionality provided by the JBA System 21 Standard Software Products." Both JBA and Hartmarx warranted the contract "constitutes the entire understanding and agreement between the parties and supersedes all prior or contemporaneous agreements or understanding, whether oral or written" (hereinafter "integration clause"). And Hartmarx warranted it "has not relied on any other warranty or representation in its decision to execute the Agreement and purchase goods and/or services" (hereinafter "non-reliance clause").

Pursuant to the Agreement, the ERP project would proceed in four stages: Design and Construction (of the enhancements by JBA), Testing (of the Software by Price and Hartmarx), and Implementation. The first sign of trouble occurred when JBA failed to meet the deadlines set forth in the Agreement for delivery of the enhancements. Although a portion were due by December 31, 1997, on that date, JBA delivered General Version 3.5.0 of the standard software containing none of the promised enhancements. As for the

---

full-function application software which was integrated, flexible and time tested in similar environments; (4) JBA would develop custom enhancements for the System 21 software to the extent that there were any gaps in the software that did not already meet Hartmarx's functional requirements; (5) JBA had the expertise, resources, technology, and project management methodology to deliver to Hartmarx the full range of custom services; (6) JBA would provide education, implementation support, and project management consulting services; (7) JBA's quality control had improved significantly with regard to updated releases of the System 21 software. (*See* Compl. ¶¶ 9-13; Hartmarx Corp.'s Am. Answers to JBA Intl., Inc.'s Second Set of Interrogs. at No. 5).

remaining enhancements that were to be completed and delivered by February 15, 1998, that deadline was not met either. After much wrangling back and forth, JBA finally delivered to Hartmarx in April 1998, Version 3.5.2 of the software, "a controlled availability" release JBA represented as being a few weeks short of general availability. Price and Hartmarx proceeded to test the software, only to experience stability issues and discover a number of bugs. Furthermore, the delivered software contained some, but not all of the contracted for enhancements. After Price and Hartmarx expressed concerns about the software's quality, JBA made efforts to correct the problems.

Finally after receiving assurances from JBA that the software was stable, in Summer 1998, Hartmarx "went live"[2] at one of its operating units, Bobby Jones. However, upon doing so, the software consistently crashed, and Price and Hartmarx discovered bugs in the software modules. Questions once again arose regarding the quality of JBA's software. As the software continued to malfunction, the finger pointing began. Hartmarx and Price blamed JBA for supplying unstable and bug-ridden software. JBA, in turn, criticized Price's poor installation of the software and improper training of users, and Hartmarx's use of a PKMS interface at Bobby Jones that interfered with JBA's software.

Hartmarx never moved to the final phase of the project–implementing the software in its other divisions. Instead, in June 1999, Hartmarx terminated the ERP project and filed this action alleging JBA fraudulently induced Hartmarx to enter into the Agreement, and breached the contract. In response, JBA filed a counterclaim, contending Hartmarx never paid for additional customization services JBA engaged in while trying to fix the software problems created by Hartmarx and Price. JBA and Hartmarx each move for summary judgment on the other's claims.

## STANDARD OF REVIEW

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It would thus be appropriate for the Court to enter summary judgment against "a party who fails to make

---

[2]The parties do not specifically explain the meaning of this term, but the Court surmises it refers to Hartmarx installing and running the actual software on its information system.

a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 479 (7th Cir. 1996) (citations omitted).

The party moving for summary judgment bears the initial burden of submitting affidavits or other evidentiary material to show the absence of a genuine material issue of fact and that judgment as a matter of law should be granted in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A genuine issue of material fact exists only where the dispute over facts might affect the outcome of the lawsuit and there is sufficient evidence to support a jury verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once the moving party has met the initial burden, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial" in order to avert summary judgment. *Id.* at 250. Finally, in conducting its summary judgment analysis, the Court construes the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.3d 1307, 1312 (7th Cir. 1989).

## ANALYSIS

### I. JBA's Motion for Summary Judgment

#### A. Fraudulent Inducement (Count II)

Hartmarx contends JBA made a number of oral and written misrepresentations concerning the functional capabilities of its Style 21 software and JBA's availability to provide software implementation services that induced Hartmarx to enter into the Agreement. To succeed on a claim for common law fraud in the formation of a contract, Hartmarx must show, *inter alia*, that its reliance upon JBA's alleged misrepresentations was justifiable. *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001); *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996). Citing *Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000), JBA argues that, as a matter of law, Hartmarx's reliance was unreasonable in light of the non-reliance and integration clauses contained in the Agreement. JBA reads *Rissman* as automatically precluding any fraud or deceit claim based on precontractual statements where a party has warranted that the contract supercedes all prior oral or written agreements, and that it is not relying on any representations other than those set forth in the contract itself. However, this Court

-5-

concludes *Rissman* does not reach that far.

In *Rissman*, plaintiff/seller/minority shareholder claimed defendant/buyer/majority shareholder deceived him into selling his shares of stock with a promise to never sell the company to a third party. *Id.* at 382. Prior to the stock sale, defendant had orally represented to plaintiff he would not sell the company, but when pressed to include that promise in the written Stock Purchase Agreement, defendant refused to do so. *Id.* at 383. Furthermore, the subsequently executed Purchase Agreement specifically provided for accelerated payments of the purchase price to plaintiff if the company was sold before he received all installments, and, significantly, plaintiff represented he was not relying on any prior statements or representations by defendant. *Id.* Nevertheless, when defendant sold the company over a year later and realized a substantial profit, plaintiff sued alleging securities fraud. *Id.* at 382. The Seventh Circuit wasted no time rejecting plaintiff's claim on the basis that he could not have reasonably relied on defendant's "no sale" representation in light of the language in the Purchase Agreement discussing the possibility of sale, and his representation he had not relied on previously made statements. *Id.* at 383.

*Rissman*, purporting to follow two other Courts of Appeals that had held "non-reliance clauses in written stock-purchase agreements preclude any possibility of damages under the federal securities laws for prior oral statements," stated its holding as follows: "a written anti-reliance clause precludes any claim of deceit by prior representations." *Id.* at 383-84. Seizing upon that broad language, JBA argues Hartmarx's fraudulent inducement claim, like plaintiff's fraud claim in *Rissman*, is automatically foreclosed because of the non-reliance clause in the Agreement. However, this Court cannot take one statement in an opinion out of its context and blindly apply it to every situation involving a fraud claim based on precontractual statements and a written contract containing non-reliance and/or integration clauses. To do so would ignore the underlying rationale of *Rissman*, which is that "a person who has received written disclosure of the truth may not claim to rely on contrary oral falsehoods." *Id.* at 384.

Indeed, the fact that plaintiff represented he was not relying on prior statements, standing alone, was not the reason his securities fraud claim failed. Rather, it was the presence of the non-reliance clause in a contract that clearly contradicted the prior statement plaintiff claimed to have relied upon that proved fatal. *Id.* at 383 ("Having signed an agreement providing for acceleration as a consequence of sale,

[plaintiff] is in no position to contend that he relied on the impossibility of sale."). *Cf. J.C. Whitney & Co. v. Renaissance Software Corp.*, No. 99 C 3714, 2000 WL 556610, at *10 (N.D. Ill. April 19, 2000), *adopted in relevant part, modified on other grounds*, 98 F. Supp. 2d 981 (2000) (collecting cases applying Illinois law which states that "reliance on precontractual fraud statements is precluded as unreasonable only where the contract 'flatly contradicts' them"). Even the appellate court cases *Rissman* relied upon, *Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411 (1st Cir. 1989) and *One-O-One Enter., Inc. v. Caruso*, 848 F.2d 1283 (D.C. Cir. 1988), focused on more than just the existence of non-reliance and/or integration clauses in finding no justifiable reliance. For example, in *One-O-One Enterprises*, the D.C. Circuit noted a specific, very significant representation previously agreed to by the defendant had not been included in the parties' final agreement containing an integration clause, and thus concluded plaintiff unreasonably relied on the continued viability of that prior statement. 848 F.2d at 1287. Similarly, in *Jackvony*, the First Circuit explained that it considered eight separate factors in determining if an investor's reliance was reasonable.[3] As Judge Rovner points out in her concurring opinion in *Rissman*, "the issue of reasonable reliance has always depended upon an analysis of all relevant circumstances." 213 F.3d at 389 (emphasis supplied). Thus, for this Court to hold that the mere inclusion of non-reliance and integration clauses (provisions *Rissman* recognized are boilerplate) in a contract negotiated by counsel representing two sophisticated parties automatically defeats a fraudulent inducement claim would stretch *Rissman* far beyond its intended result.

Instead, to determine whether Hartmarx's reliance was justified, this Court must also consider "all of the *facts* that [Hartmarx] knew, as well as those *facts* [Hartmarx] could have learned through the exercise of ordinary prudence." *Cozzi*, 250 F.3d at 574 (emphasis added). That the Seventh Circuit did not intend to reject outright all fraud claims involving sophisticated parties and a non-reliance provision is evidenced by *Cozzi, supra*, a case decided after *Rissman*. In *Cozzi*, an equipment lessee argued that the

---

[3](1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality of specificity of the misrepresentations. *Jackvony*, 873 F.3d at 416.

lessor committed fraud by including provisions in its written leases that differed from its prior oral representations. *Id.* at 573. The *Cozzi* court stated that the relevant inquiry for a fraudulent inducement claim under Illinois law is whether "the complaining party could have discovered the fraud by reading the contract and had the opportunity to do so." *Id.* at 574 (citing Illinois cases). Thus, in analyzing this issue, the *Cozzi* court first examined the written lease to determine if it contained evidence of the alleged fraud. *See, e.g., Chicago Printing Co. v. Heidelberg*, No. 01C3251, 2001 WL 1134862 at *5 (N.D. Ill. Sept. 25, 2001); *Budget Rent a Car Corp. v. Genesys Software Sys, Inc.*, No. 96C0944, 1997 WL 201549 at *3 (N.D. Ill. April 17, 1997). The Seventh Circuit then concluded that given the clear contradiction between the lease terms and prior representations, <u>and</u> the no-reliance language in the lease, <u>and</u> the fact that the lessee was a sophisticated business with experience in entering into contracts, the lessee's reliance as a matter of law was not justified. Significantly, the *Cozzi* court never mentioned *Rissman*.

Therefore, this Court rejects JBA's argument that *Rissman* creates an automatic rule barring fraud claims solely because a contract contains non-reliance and integration clauses. While those provisions are certainly relevant to the justifiable reliance analysis, their mere presence alone is not sufficient to defeat a fraud claim as a matter of law. Rather, this Court must undertake a careful consideration of all relevant facts to determine if a contracting party could have discovered the alleged fraud by reading the contract. Although JBA cites *American Bankcard Int'l, Inc. v. Schlumberger Tech., Inc.*, No. 99C6434, 2001 WL 1465760, at *3 (N.D. Ill. Nov. 14, 2001), in support of its broad interpretation of *Rissman*, this Court respectfully declines to follow an unpublished district court decision when it is clear neither of the relevant Seventh Circuit decisions, *Rissman* or *Cozzi*, mandates such a result.

This Court is not finding, as Hartmarx suggests, that *Rissman* is limited to claims of federal securities fraud. Indeed, the general principle underlying *Rissman* –that parties to a contract cannot rely on precontractual statements that are contrary to the terms of the written document – applies in various contexts. Nevertheless, this Court does not believe the Seventh Circuit intended for *Rissman*, a case arising under federal law, to preclude a common law fraud claim grounded in state law. As a federal court sitting in diversity jurisdiction, this Court must apply the law of the state in which it is sitting. JBA has not pointed to a single case in which the Illinois Supreme Court has indicated a willingness to abrogate

fraudulent inducement claims under the circumstances JBA points to as determinative in this case. Therefore this Court is not inclined to do so either. Accordingly, JBA's motion for summary judgment on Count II of the Complaint is denied.[4]

### B. Illinois Consumer Fraud Act (Count I)

Next, Hartmarx contends JBA made precontractual and postcontractual representations that violated the ICFA, 815 ILCS 505/1 *et seq*. JBA challenges the ICFA claim on two grounds, (1) consumer nexus requirement and (2) materiality, but the Court finds neither argument persuasive.

#### Consumer Nexus

JBA's first contention, that Hartmarx is not a consumer for purposes of the ICFA because it is a company that purchased custom-designed software, is disingenuous. While the term "consumer" is defined as meaning "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household," 815 ILCS 505/1(e), "person" refers to any "partnership, corporation (domestic and foreign), company, trust, business entity or association," 815 ILCS 505/1(c). Use of the pronouns "he" and "his" therefore does not suggest any intent to limit the realm of protected consumers to individuals only. Indeed, the ICFA makes no distinction between a company licensing software for its own use, and an individual buying software for his personal computer. Each, as a purchaser of merchandise, is entitled to invoke the protections of the ICFA. *See Law Offices of William J. Stogsdill v. Cragin Fed. Bank for Sav.*, 645 N.E.2d 564, 566-67 (Ill. App. Ct. 2d Dist. 1995) (reasoning "[t]he fact that both parties to the transaction are business entities does not render the [ICFA] inapplicable," in finding a law office fit the broad statutory definition of consumer).

Hartmarx's consumer status notwithstanding, JBA insists this case involves nothing more than a contract dispute between two businesses and, as such, Hartmarx must also "meet the consumer nexus test by [showing] that the conduct involves trade practices directed to the market generally or otherwise

---

[4]JBA also asks this Court to strike Hartmarx's amended interrogatory answers setting forth additional misrepresentations. (JBA Reply Mem. No. 1 Supp. its Mot. for Summ. J. - Common Law Fraud, at pp.13-15.) However, because JBA concedes the substance of the alleged misrepresentations is not at issue in its motion for summary judgment on Count II, the propriety of the amended answers is irrelevant to this Court's analysis. Therefore, JBA's request will be disregarded.

implicates consumer protection concerns." *Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 437 (7th Cir. 1996). Contrary to JBA's assertions, however, it is not clear Illinois courts require a consumer nexus where plaintiff is actually a business consumer of defendant's merchandise. In *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 546 N.E.2d 33 (Ill. App. Ct. 2d Dist. 1989), the Illinois Appellate Court had before it a plaintiff who was not a consumer for purposes of the ICFA. In rejecting the argument that the protections of the ICFA were limited to consumers only, the court explained that the legislature intended for courts to liberally construe the ICFA to provide remedies for anyone sustaining injuries as a result of deceptive and unfair business practices. *Id.* at 41. That intent notwithstanding, the court defined the relevant inquiry as "whether the alleged conduct has characteristics which bring it within the [scope of the ICFA]." *Id.* And, it went on to state, the proper test "where the dispute involves two businesses who are not consumers" is whether the alleged conduct demonstrates a consumer nexus. *Id.*

Similarly, in *Lake County Grading Co. of Libertyville, Inc. v. Advance Mech. Contractors, Inc.*, 654 N.E.2d 1109 (Ill. App. Ct. 2d Dist. 1995), the Illinois Appellate Court addressed an ICFA claim arising out of a construction contract between a general contractor and a subcontractor. Looking to *Downers Grove* for guidance (because the situation involved parties who were not consumers of each other's goods or services), the court rejected plaintiff's ICFA claim on the basis that it did not involve an inherent consumer interest, or invoke consumer protection concerns. *Id.* at 1116. Even *Athey*, a Seventh Circuit decision, and the cases it says impose the consumer nexus test (including *Lake County Grading, supra*), concern non-consumer businesses. *See Athey*, 89 F.3d at 432, *Scarsdale Builders, Inc. v. Ryland Group, Inc.*, 911 F. Supp. 337, 340 (N.D. Ill. 1996); *Web Communications Group, Inc. v. Gateway 2000, Inc.*, 889 F. Supp. 316, 323 (N.D. Ill. 1995).[5]

Nevertheless, this Court recognizes the ICFA "was not intended to cover all commercial

---

[5]JBA contends this Court should follow an unpublished factually similar district court decision, *Cold Spring Granite Co. v. Info. Mgmt. Assocs., Inc.*, No. 99C6690, 1999 WL 1249337, at *4 (N.D. Ill. Dec. 17, 1999), where Judge Conlon purportedly relied on *Scarsdale, supra*, in requiring a business plaintiff/consumer to allege conduct implicating consumer protection concerns. However, as this Court has already noted above, it is not persuaded *Scarsdale* stands for that proposition, and, as such, respectfully declines to adopt Judge Conlon's rationale.

transactions regardless of the relationship between the parties involved." *Lake County Grading*, 654 N.E.2d at 1114. Consequently if, as JBA contends, the ICFA claim here, at its core, is a breach of contract claim, then regardless of whether Hartmarx is a consumer, relief is not warranted under the ICFA. *See Commonwealth Ins. Co. v. Stone Container Corp.*, No. 99C8471, 2001 WL 477151, at *4 (N.D. Ill. May 3, 2001). Hartmarx alleges JBA was not forthright about quality problems with its Style 21 software, or the resources available to effectuate what the parties anticipated would be a complex, time-consuming and costly ERP project. By challenging the veracity of the representations made by JBA to induce Hartmarx to enter into the software contract, Hartmarx states a fraudulent misrepresentation claim. *See, e.g., Ottawa Strong & Strong v. McLeod Bishop Systs.*, 676 F. Supp. 159, 160 (N.D. Ill. 1987). Accordingly, Hartmarx, as a business-consumer bringing a fraud claim, may proceed under the ICFA. *See Commonwealth Ins. Co.*, 2001 WL 477151, at *5.[6]

### Material Misrepresentation

JBA also challenges whether its alleged misrepresentations are material. Only "[a]n omission or concealment of a material fact in the conduct of trade or commerce constitutes consumer fraud" in violation of the ICFA. *Connick*, 675 N.E.2d at 595. According to *L.R.J. Ryan v. Wersi Elec. GmbH and Co.*, 59 F.3d 52 (7th Cir. 1995), a case cited by JBA, "[t]o be material under Illinois law, the misrepresented fact must be essential to the transaction between the parties." 59 F.2d at 54. JBA argues that none of the alleged misrepresentations were specifically included in the Agreement containing non-reliance and integration clauses, and therefore, under *Ryan*, they cannot be considered material. This Court finds no need to delve into the effect of *Ryan*, however, because that case does not control this analysis. Rather, *Connick*, an Illinois Supreme Court decision rendered over a year after *Ryan* is where this Court focuses its attention. In analyzing an ICFA claim, *Connick* explains that "[a] material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type of information upon

---

[6]Alternatively, Hartmarx also identifies a consumer protection concern. *See Prime Leasing, Inc. v. CMC Lease, Inc.*, No. 99C0449, 1999 WL 1285847, at *4 (N.D. Ill. Dec. 29, 1999) ("These defendants have not attempted to explain exactly how the fraudulent inducement of one party–be it a corporation, individual, or other entity–to hand over thousands or millions of dollars to another party on false pretenses, is not a consumer protection concern.")

which a buyer would be expected to rely in making a decision whether to purchase." 675 N.E.2d at 595. So while *Ryan* arguably sets forth a subjective test, i.e., look at the particular circumstances in determining materiality, *Connick* makes it clear that there is also an objective component to the inquiry, i.e., ascertain what information would be relevant to a typical buyer.

When looked at objectively, there can be no doubt that JBA's alleged misrepresentations concerning the capabilities of its software, and the availability of personnel to ensure the success of this project, are material facts a consumer would rely upon in deciding whether to select JBA or some other software vendor to implement its new information system. *Compare Connick*, 675 N.E.2d at 595 (finding safety problems of a vehicle material to consumers) *with Oliveira v. Amoco Oil Co.*, 726 N.E.2d 51, 59 (Ill. App. Ct. 4th Dist. 2000) (assertions that premium gasolines were better for the environment and a consumer's car constitute material facts consumers would rely upon in deciding which brand of gasoline to purchase). Thus, JBA has failed to demonstrate it is entitled to summary judgment as a matter of law on Count I of the Complaint.

### C. Breach of Contract (Count III)

Hartmarx contends JBA breached the contract in several ways -- the standard software did not perform the functional requirements; JBA provided a pre-release version of the software; JBA failed to deliver the contracted for enhancements either at all or in a timely manner; JBA did not provide user manuals or consulting services to meet the implementation requirements; and to the extent services were provided, it was done by independent contractors who were neither knowledgeable nor experienced JBA employees. (Compl. ¶ 52). JBA maintains Hartmarx's breach claim fails because there is no proof the software delivered in April 1998 (Version 3.5.2) did not contain the contracted-for enhancements. Hartmarx responds its breach claim is not limited to the enhancements only. A quick perusal of the Complaint reveals Hartmarx is correct on that point; nonetheless it is apparent to the Court that the major thrust of Hartmarx's breach claim concerns the functionality and quality of the Style 21 software JBA provided pursuant to the terms of the Agreement (particularly Version 3.5.2). The Court will therefore limit its consideration to that issue.

Because JBA seeks summary judgment on the basis that Hartmarx lacks proof of a material fact,

i.e., that the software supplied did not comply with the contractual specifications, the Court must ask "not whether [it] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. Turning to the evidence, Hartmarx has presented written documents, as well as statements from various individuals involved in this project, including JBA personnel, to support its contention that the software it received from JBA was not only unstable and bug-ridden, but also did not contain all of the promised enhancements. (*See, e.g.,* Hartmarx's 56.1(b)(3)(B) Statement of Additional Material Facts, Exs. 83, 86, 94, 100; Dep. Tr. of John M. Bielecki at 143, 177; Dep. Tr. of Mark Troth at 195). Given the volume of documentation delineating a host of software problems, the Court concludes a jury could reasonably find in favor of Hartmarx on its breach claim. At trial the evidence may ultimately show, as JBA maintains, that these malfunctions were attributable to actions by Price and Hartmarx. But at the summary judgment stage, it is not for this Court to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Hartmarx has carried its burden of coming forward with enough evidentiary support to create triable issues of fact as to whether JBA breached the Agreement. Therefore summary judgment on Count III must be denied.[7]

## II. Hartmarx's Motion for Partial Summary Judgment (Counts II and III)

In its counterclaim, JBA contends Hartmarx failed to pay for contractual and out-of-scope services performed by JBA, and seeks to recover for that work under theories of breach of contract (count I), breach of oral or implied in fact contract (count II) and quantum meruit (count III). Hartmarx moves for summary judgment on Counts II and III only, contending JBA cannot proceed on those theories because recovery for the particular extra work claims asserted by JBA is controlled by the written contract.

Illinois law is straightforward regarding quasi-contractual claims -- it does not permit recovery

---

[7]JBA argues this Court should penalize Hartmarx for "destroying" the original software by dismissing this breach claim, since the primary, objective evidence that could prove or disprove Hartmarx's breach claim is unavailable. Unlike the cases cited by JBA in its supporting memorandum, the actual software is not critical to this case. Individuals who worked on this project can attest to whether Version 3.5.2 matched the contract specifications. Consequently, JBA is hardly prejudiced because the original software, which the parties concede has been heavily modified by programmers attempting to fix the bugs, cannot be produced at trial.

under such theories when a real contract governs the parties' relations. *Murray v. ABT Assocs., Inc.*, 18 F.3d 1376, 1379 (7th Cir. 1994) (rejecting a quantum meruit claim). Indeed, an implied in fact contract will not be recognized if there is an express contract between the parties concerning the same subject on which the implied contract claim rests. *Conway Corp. v. Alpha Distribs., Ltd.*, No. 91C2762, 1992 WL 57950, at *5 (N.D. Ill. March 20, 1992). The issue to be resolved, then, is whether the written Agreement affords recovery for the additional work JBA claims to have performed. If it does, then JBA must look to the contract for recovery. If it does not, then JBA can seek recovery under equitable theories of relief.

In responding to Hartmarx's summary judgment motion, JBA identifies four categories of out-of-scope services for which it has not received compensation: (1) additional education regarding JBA's software; (2) additional gaps identified during the design phase; (3) implementation of other software (interfaces) to interact with JBA's software programs (including consulting services); and (4) general implementation support for the entire project. Hartmarx contends each of these services is provided for in the contract. After thoroughly reviewing the Agreement, this Court agrees the written contract expressly provided for JBA to receive compensation for the extra work allegedly performed on this project.

The Agreement addresses the possibility of additional work in several sections. First, Schedule SA of the Schedule of Services sets forth implementation fees for JBA to perform the following services: train Hartmarx personnel on its software; design customized software enhancements; and implement customized software products. However the parties also agreed if Hartmarx modified the scope of requested services, JBA could adjust its estimated costs accordingly. Thus recovery for additional education and general implementation support beyond the terms of the contract is provided for under this section. Next, in a provision entitled "Non-JBA Errors," Hartmarx agreed to pay JBA for work performed in investigating and correcting problems with non-JBA software products. Clearly interface implementation work is included in this category. Finally, in delineating the enhancements to be designed, Schedule E of the Agreement allows JBA to charge additional customization costs for changes in the design of proposed software modifications. The work required to fix gaps discovered during the design phase of the project falls squarely within that section.

JBA does not seriously contest the fact that the Agreement addresses its currently identified extra

work claims. Instead JBA argues it should be allowed to proceed to trial because there may be more services not covered under the contract for which it will seek compensation. But the time to come forward with all of its evidence in order to defeat summary judgment is now. *See, e.g., Celotex Corp.*, 477 U.S. at 326. Absent a showing by JBA establishing an essential element of the claim, i.e., that recovery for its out-of-scope services is not governed by the express contract, there is simply no genuine issue as to any material fact that would warrant a trial. *Id.* at 322. Hartmarx concedes the requested services are provided for in the contract, and JBA has not shown otherwise. Because the Agreement governs the disposition of these extra work claims, as a matter of law, JBA cannot seek recovery under theories of implied contract or quantum meruit. Accordingly, Hartmarx is entitled to summary judgment on Counts II and III.

## Conclusion

The Court denies JBA's motion for summary judgment on Counts I, II, and III of the Complaint, and grants Hartmarx's motion for partial summary judgment on Counts II and III of the counterclaim.
**IT IS SO ORDERED.**

WILLIAM J. HIBBLER, DISTRICT JUDGE

DATED: March 14, 2002